2015 VT 77

## James Glassford and Heidi Glassford v. Dufresne & Associates, P.C.

[124 A.3d 822]

No. 14-194

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.**

Opinion Filed June 12, 2015

---

*Kimberly B. Cheney* of *Cheney, Saudek & Grayck PC*, Montpelier, for Plaintiffs-Appellants.

*Philip C. Woodward* of *Woodward & Kelley, PLLC*, South Burlington, for Defendant-Appellee.

¶ 1. **Dooley, J.** Plaintiffs Heidi and James Glassford appeal the decision of the Washington Superior Court denying summary judgment to plaintiffs and granting summary judgment to defendant Dufresne & Associates, P.C. on plaintiffs' claims of negligent misrepresentation and violation of the Vermont Consumer Protection Act (CPA). We affirm.

¶ 2. The following facts are undisputed. Plaintiffs are homeowners who purchased their home direct from the builder, D&L Homes by Design, LLC (D&L). D&L hired defendant to certify that the on-site mound sewage disposal system constructed for the home satisfied state permitting requirements. This certification was made pursuant to 10 V.S.A. § 1973, which requires a permit

for "constructing, replacing, or modifying a potable water supply or wastewater system," *id.* § 1973(a)(3), and imposes the certification requirement as follows:

> (e) No permit issued by the Secretary shall be valid for a substantially completed potable water supply and wastewater system until the Secretary receives a statement from an installer or a licensed designer certifying that, in the exercise of his or her reasonable professional judgment, the installation-related information submitted is true and correct and the potable water supply and wastewater system:
>
>> (1) were installed in accordance with:
>>
>>> (A) the permitted design and all permit conditions; or
>>>
>>> (B) record drawings and such record drawings are in compliance with the applicable rules, were filed with the Secretary, and are in accordance with all other permit conditions;
>>
>> (2) were inspected;
>>
>> (3) were properly tested; and
>>
>> (4) have successfully met those performance tests.

*Id.* § 1973(e).

¶ 3. ▮▮▮ As the language of the statute makes clear, this is a post-permit requirement that must be completed before the permit becomes effective. The statute does not require that the certification be recorded in the land records, and it provides no private remedy against an installer or licensed designer who made inaccurate representations in the statement. The Secretary of Natural Resources is authorized to take certain enforcement actions with respect to § 1973.

¶ 4. On April 19, 2005, the Vermont Agency of Natural Resources issued a Wastewater System and Potable Water Supply Permit for construction of the sewage disposal system on the property, subject to receiving a certification pursuant to § 1973(e). On October 20, 2005, defendant's employee sent to the Agency the certification required by § 1973(e), stating as follows: "I hereby certify that, in the exercise of my reasonable professional judgment, the installation-related information submitted is true and

correct and the wastewater system was installed in accordance with the permitted design and all permit conditions, was inspected, was properly tested, and has successfully met those performance tests." Defendant's certification was for the Agency's use in determining whether the system was installed according to the permitted design.[1] On November 4, 2005, the Agency wrote defendant stating that "all conditions pertaining to . . . [the] permit have been satisfied."

¶ 5. On December 20, 2005, plaintiffs signed a purchase-and-sale agreement to purchase the home from D&L. Although the seller represented that the home and property had received all the necessary permits, plaintiffs never saw the certificate or the letter from the Agency stating that the certification requirement was satisfied. Sometime thereafter, plaintiffs hired an attorney in connection with the closing, which occurred on January 17, 2006. On January 13, just prior to the closing, plaintiffs' attorney prepared a certificate of title that noted the wastewater and water supply permit and stated: "The permit requires a certificate from the designer or installer filed with [the] District Environmental Office certifying completion of the water and sewage conditions." The title certificate was provided to plaintiffs and was not thereafter amended. Correspondence between plaintiffs' attorney and the attorney for the seller included a request for a copy of the water and sewage certificate, and a copy was included in a FAX from January 12. In an affidavit, plaintiff Heidi Glassford

---

[1] The parties do not dispute that the certificate was intended for the Agency's use in approving a wastewater permit for the property, but implicit in their briefs is a dispute over whether the certificate was intended for any other use. Defendant asserts in its statement of undisputed facts that "any use beyond [permitting] was not the intent of the certification," but also argues in its brief that this is a disputed fact that requires resolution for plaintiffs to succeed on summary judgment. Strangely, plaintiffs respond to this assertion by stating that "[t]he statutes cited by plaintiffs define the purpose of the certification — it is not something Defendant is free to vary."

We do not see where and how this fact is in dispute, nor do we read defendant's statement as an attempt to "vary" the statutes. Section 1973(e) requires certification from a licensed professional before a permit is effective. Clearly the Agency is the intended recipient. That other parties may benefit from or rely on such information does not alter the intent. This is not a fact that the superior court relied on in its decision, and while we believe this has some relevance to the issue, we discern no live dispute that any other party was the intended recipient of the certificate or that it served any purpose other than rendering the necessary permits effective.

stated, "We would not have purchased the property if Attorney Palmisano had warned us that the certificate was missing and might be a cause of concern about our title to the property, or the proper construction of the waste water system." Plaintiffs never saw the certificate until after the sewage disposal system failed.

¶ 6. In February 2006, the sewage disposal system failed. In November 2008, plaintiffs hired defendant to investigate the system's failure because they knew defendant had inspected the system prior to their purchase. Defendant prepared a report stating that he had "completed the original" inspection in 2005 and found the system had been installed according to the permitted design. Plaintiffs received other opinions about the disposal system's failure both before and after hiring defendant to inspect the system.[2] In general, plaintiffs' position is that the sewage disposal system failed because the soil placed over the system was improperly graded.[3] Defendant's position is that the system failed because the house was too large, plaintiffs operated a daycare center that added to the wastewater entering the system, and plaintiffs' horses were allowed to walk over the system.

¶ 7. Plaintiffs filed a complaint in superior court alleging pecuniary losses from defendant's failure to properly inspect the sewage disposal system and subsequent misrepresentation about the construction of the system in the certification to the Agency.[4] Specifically, they alleged damages in tort for negligence — which, as discussed below, the superior court defined as a negligent misrepresentation claim — and under the CPA. Both parties

---

[2] Defendant argues that the reason for the sewage disposal system's failure is "hotly disputed" and that consequently plaintiffs' summary judgment motion cannot survive. Plaintiffs, on the other hand, contest that this fact is in dispute, citing procedural failures on the part of defendant in submitting the appropriate documents in compliance with Vermont Rule of Civil Procedure 56(c). Indeed the survival of plaintiffs' claims — and the grant of their summary judgment motion — depends on defendant's responsibility for the failure of the sewage disposal system. We need not resolve this issue, however, because even assuming plaintiffs' version of the facts is undisputed, plaintiffs are not entitled to judgment as a matter of law on their claims. As we explain in our analysis below, defendant is entitled to summary judgment no matter the cause of the system's failure.

[3] Plaintiffs' expert also concluded that a collar between the concrete container for the pump and the cover allowing access to the pump was not sealed properly. Plaintiffs have not relied upon this alleged deficiency in their brief to this Court.

[4] Plaintiffs also alleged breach of contract between D&L and defendant and violation of the CPA on the 2005 contract between plaintiffs and defendant. Plaintiffs have abandoned these claims on appeal.

moved for summary judgment, and the court entered judgment for defendant on both claims.

¶ 8. As related to this appeal, the superior court held that plaintiffs' negligent misrepresentation claim failed because plaintiffs did not see defendant's certification until the proceedings in this case and therefore did not rely on the alleged misrepresentation. With respect to the CPA claim, the court held that the claim failed because the parties did not contract for a sale of goods or services as required under the CPA. Plaintiffs appealed.

¶ 9. On appeal, plaintiffs argue that, with respect to the negligent misrepresentation claim, the superior court erred in finding that they did not rely on the certificate. They contend that defendant was under a public duty to furnish this information and that therefore they fall within the class of plaintiffs sought to be protected by the public duty. They further contend that, although they never saw the certificate prior to their purchase, they relied on it through their agent attorney, whose knowledge of the certificate was imputed to plaintiffs. They also argue that the superior court erred in concluding that the CPA requires privity between the parties and instead should have held defendant liable as an indirect seller. We disagree with plaintiffs and affirm the superior court's grant of summary judgment for defendant.

¶ 10. We review summary judgment decisions de novo under the same standard as the trial court. *Stone v. Town of Irasburg*, 2014 VT 43, ¶ 25, 196 Vt. 356, 98 A.3d 769. Summary judgment will be granted when, viewing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.*; see V.R.C.P. 56(a).

¶ 11. Before turning to plaintiffs' claims, we emphasize what we are deciding under this standard of review. As noted in the footnotes above, defendant disputes several facts critical to plaintiffs' claims, and the absence of these material facts — facts that link defendant to the failure of the sewage disposal system — defeats plaintiffs' summary judgment motion. Assuming without deciding that plaintiffs' version of the disposal system's failure is undisputed, we still conclude that plaintiffs' claims of negligent misrepresentation and violation of the CPA fail before even reaching the causation issue. The superior court did not need to consider that issue in its decision, and neither do we.

¶ 12. ■ We start with plaintiffs' claim of negligent misrepresentation. As noted above, plaintiffs claim only economic losses, which usually are precluded in a tort action. *Long Trail House Condo. Ass'n v. Engelberth Constr., Inc.*, 2012 VT 80, ¶ 10, 192 Vt. 322, 59 A.3d 752. Plaintiffs argued below that their case fits into an exception to the economic loss rule where a special relationship exists between the parties, particularly in the context of professional malpractice. According to plaintiffs, that special relationship was created by defendant's statutory duty to file a certificate with the Agency. The superior court found the proper framework for plaintiffs' claim under the common law tort of negligent misrepresentation, as defined in Restatement (Second) of Torts § 552 (1977) [hereinafter the Restatement], which provides a cause of action for "information negligently supplied for the guidance of others." We previously have adopted this section of the Restatement for claims of negligent misrepresentation, *Limoge v. People's Trust Co.*, 168 Vt. 265, 268, 719 A.2d 888, 890 (1998), and do so here.

¶ 13. ■ Section 552 of the Restatement provides:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the

class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

¶ 14. ■ The central questions in our inquiry under the Restatement are whether plaintiffs fall within the class protected by the section and, if so, whether they relied on the statements made by defendant in its certification. We start with subsection (2), which limits a defendant's liability under § 552 to specific plaintiffs and transactions. As highlighted in the comments and illustrations, liability under subsection (2) attaches "only to those persons for whose benefit and guidance it is supplied." Restatement § 552 cmt. h. This liability is narrower than liability for fraudulent misrepresentation under Restatement § 531, which attaches when a plaintiff's reliance on the misrepresentation is reasonably foreseeable. As explained in comment h, the intended recipient of information under § 552(2) need not be identifiable to the defendant as a potential plaintiff at the time the information is disseminated, but rather, the defendant must intend the information "to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance on it." *Id.* In other words, it is not sufficient that the defendant "merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated." *Id.*

¶ 15. ■ Turning to the facts here, plaintiffs were not the intended recipient of the certificate. The certificate was provided to the Agency for determining compliance with the permitted design and was not intended for use by homebuyers in deciding whether or not to effect a purchase. That homebuyers, like plaintiffs, may at some point obtain the information is merely incidental and does not create a cause of action under subsection (2).

¶ 16. ■ Concluding that plaintiffs have no claim under § 552(2), we turn to subsection (3), an exception to the limits on liability defined in subsection (2) for defendants that have a duty to provide information for the benefit of the public. This includes

private individuals or entities under a statutory duty to supply information. Restatement § 552 cmt. k. For example, if a notary public negligently acknowledges a signature on a deed that turns out to be a forgery and a purchaser relies on the recorded deed in purchasing land, the notary is liable to the purchaser for any pecuniary losses as a result of the invalid deed. *Id.* illus. 16 (citing *Mulroy v. Wright*, 240 N.W. 116, 116-18 (Minn. 1931)). As made clear by this and other illustrations under comment k, subsection (3) removes the limitation of subsection (2) that narrows the class of potential plaintiffs, and instead subjects the defendant to liability for losses "to any of the class of persons for whose benefit the duty is created." *Id.* § 552 cmt. k. Here, defendant's duty is derived from 10 V.S.A. § 1973, and plaintiffs clearly fall within the class of persons — those purchasing a newly constructed wastewater disposal system — for whose benefit this statutory duty was created.[5] Nonetheless, as explained in the following analysis, plaintiffs' claim still fails under subsection (3) because plaintiffs demonstrated no actual, or direct, reliance[6] on the certificate.

¶ 17. ■ Although the superior court never explicitly stated which provision of § 552 it was applying in its analysis, it concluded that plaintiffs' claim failed for lack of direct reliance. Direct reliance is required under § 552(1) and also applies to claims under § 552(2) and (3). Plaintiffs, however, misread the court's discussion of direct reliance and confuse the concept of direct *reliance* with direct *communication*. They attempt to undercut the court's analysis on direct reliance by citing several cases involving competitive bidding on construction projects, all of which highlight the notion that indirect communication is sufficient. For example, in *Bilt-Rite Contractors, Inc. v. Architectural Studio*, 866 A.2d 270 (Pa. 2005), the building contractor relied on the plans of the architecture firm when bidding on a school construction project. The Pennsylvania Supreme Court observed that § 552 does not require privity between the parties, such that

---

[5] It is under this public duty exception that the parties' dispute over the intended use of the certificate becomes irrelevant. While the relationship of the parties in the transaction is more determinative under subsection (2), here we need only conclude that plaintiffs were of a class *benefitted* by the certificate — not the parties for whom the certificate was *intended.*

[6] For the purposes of this discussion, the terms "actual reliance" and "direct reliance" are interchangeable. The superior court used the term "direct," while the case law is inconsistent in its use of the terms "direct" or "actual."

the information need not be conveyed directly from the firm to the contractor, and cited several cases from other state courts that have drawn similar conclusions. *Id.* at 284-86.

¶ 18. What *Bilt-Rite* and the other competitive bidding cases have in common, however, is that the contractors *directly relied* on the plans in making their bids, even though the firms that prepared the plans did not directly submit their plans to the bidders. As the court in *Bilt-Rite* noted, eliminating the need for privity in such cases is supported by the reality of "modern businesses" that one party frequently relies upon the guidance of others possessing specialized expertise, even though no direct contractual relationship exists. *Id.* at 286. While eliminating the privity requirement supports the policy of fairness and account-ability in business dealings, the element of reliance remains key.

¶ 19. ■ The comments to § 552 indicate a distinction between direct communication and direct reliance. As explained, "direct communication of the information to the person acting in reliance upon it is not necessary." Restatement § 552 cmt. g. For example, if a vendor of beans employs a public weigher who prepares a certificate that misstates the weight of the beans, it does not matter whether the weigher conveys the certificate directly to the vendee or gives it to the vendor who, in turn, conveys the information to the vendee. *Id.* The method by which the vendee receives the information does not affect the weigher's liability, but what is important is that the vendee received the information and was able to *directly rely* on that information before making the purchase. Analogizing this illustration to the facts here, it does not matter that defendant furnished the certificate to the Agency and not directly to plaintiffs; what matters is whether plaintiffs themselves relied on that certification firsthand.

¶ 20. In expressly invoking the public duty exception on appeal, plaintiffs assert that "this Court need not concern itself with 'indirect' liability because the general public is the beneficiary of the certification, and its members are presumed to have relied on it." Contrary to plaintiffs' assertion, the broadened liability under the public duty exception does not eliminate this need for direct reliance. As discussed above, the public duty exception merely enlarges the class of potential plaintiffs. While the potential plaintiffs are presumed to have benefitted from the public duty, there is no presumption of reliance.

¶ 21. On point here is *Brinkman v. Barrett Kays & Assocs.*, 575 S.E.2d 40 (N.C. Ct. App. 2003), which illustrates the need for actual reliance under the public duty exception. Factually, this case is quite similar. The plaintiffs in *Brinkman* all purchased newly constructed homes outfitted with waste removal systems designed by the defendants. The plaintiffs alleged that the defendants misrepresented the quality of the disposal systems to the Department of Environmental & Natural Resources in securing their permits for the systems and that, in turn, the plaintiffs relied on those permits in purchasing their homes. The North Carolina Court of Appeals turned to precedent of the state's high court holding that § 552 requires *actual* reliance. *Id.* at 44 (citing *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 367 S.E.2d 609, 612 (N.C. 1988)). The court concluded:

> There is no evidence in the case at bar supporting the conclusion that there was actual reliance by plaintiffs upon defendants' statements. The statements were made to the department, which relied upon them and issued permits to defendants. Plaintiffs relied upon the department to fully investigate defendants' application for permits. Plaintiffs relied upon the original permits and the re-issuance of the permits to conclude that their waste disposal system was functioning correctly. . . . However, there is no evidence that plaintiffs relied upon statements made by defendants as required by Restatement § 552(1).

*Id.* The court held that because there was no evidence of the "essential element of reliance," the plaintiffs' claim under the public duty exception fails. *Id.*

¶ 22. ■ Restatement § 552 requires "justifiable reliance" but never expressly defines the scope of that reliance. The courts largely have followed reasoning similar to that of North Carolina and have held that a negligent misrepresentation claim requires a plaintiff to rely directly on the defendant's misrepresentations and not on a third party's reliance on such information. See, e.g., *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 404 (6th Cir. 1997) ("The majority of federal courts . . . have held that § 552 of the Restatement requires actual reliance before a party may be held liable for negligent misrepresentation."); *Goldman Servs. Mech. Contracting, Inc. v. Citizens Bank & Trust Co.*, 812 F. Supp. 738, 742-43 (W.D. Ky. 1992) (finding no actionable negligent misrepre-

sentation claim where plaintiffs did not rely directly on false information in financial statements but rather relied on third party's reliance on that information in signing certificate of sufficiency qualifying surety for payment bonds); *White v. BDO Seidman, LLP*, 549 S.E.2d 490, 493-94 (Ga. Ct. App. 2001) (rejecting indirect "fraud-on-the-market"[7] reliance as inapplicable to common law negligent misrepresentation claims, which require actual reliance); *Cahill v. E. Benefit Sys., Inc.*, 603 N.E.2d 788, 792 (Ill. App. Ct. 1992) (concluding that employee did not show actual reliance because it was employer's insurer, and not employee, who relied on misrepresentation of medical review organization); *Knights of Columbus Council 3152 v. KFS BD, Inc.*, 791 N.W.2d 317, 328-31 (Neb. 2010) (declining to extend defendant's liability under public duty exception where plaintiffs did not rely directly on false information but merely on consequences of that information); *Va. Oak Venture, LLC v. Fought*, 448 S.W.3d 179, 186-87 (Tex. App. 2014) (concluding that purchaser did not show "actual and justifiable reliance" because she relied on lenders' reliance on appraisal and never saw appraisal until after purchase, and stating that "[s]tretching reliance through another party in that fashion is not supported by the law").

¶ 23. ▆▆▆ As the above-cited cases illustrate, it is not the nature of the communication that impacts the viability of a negligent misrepresentation claim, nor is it sufficient that a plaintiff detrimentally changes his or her position as a consequence of the false information. The necessary piece in this puzzle is that the plaintiff actually received or was made aware of the false statements and directly relied on those false statements. See *Knights of Columbus*, 791 N.W.2d at 326-28, 331 (explaining that even where

---

[7] The "fraud-on-the-market" theory has its origins in securities fraud claims under § 10(b) and Rule 10b-5 of the Securities Exchange Act, and posits that an investor who buys or sells stock at a price set by the market relies on the integrity of that price. As the market price is based upon publicly available information, the investor is presumed to rely on any misrepresentations that materially affected the integrity of the price. *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42, 247 (1988). This theory has been invoked repeatedly in dual claims of securities fraud and common law negligent misrepresentation, and the courts have been firm in striking down the fraud-on-the-market theory for negligent misrepresentation and requiring, instead, actual reliance on the information by the aggrieved plaintiffs. See, e.g., *In re ValuJet, Inc.*, 984 F. Supp. 1472, 1481 (N.D. Ga. 1997) (noting that majority of courts reject fraud-on-themarket theory for negligent misrepresentation claims, and collecting cases).

third-party communication is acceptable for negligent misrepresentation claim, plaintiffs must still show that they received and were made aware of misrepresentation, even under broadened § 552(3) liability).

¶ 24. ▉▉▉ Here, plaintiffs acknowledged that they never actually viewed the certificate. Rather, their attorney viewed the certificate and prepared the title report, and plaintiffs relied on the marketability of the title in their decision to close on the transfer of title to their home. This indirect reliance is insufficient to render defendant liable for its allegedly false information. The Agency relied on the certificate, and plaintiffs' attorney relied on the certificate in ensuring the marketability of the title, but plaintiffs neither received nor were made aware of the certificate until long after their home purchase.

¶ 25. Plaintiffs argue that even if § 552 does require actual reliance, they satisfied that element because their attorney, acting as their agent, directly relied on the certificate in preparing the title report, and his reliance was imputed to plaintiffs. Plaintiffs support their argument with the background principles of agency law, whereby an agent's knowledge is imputed to the principal, *Mann v. Adventure Quest, Inc.*, 2009 VT 38, ¶ 11, 186 Vt. 14, 974 A.2d 607, but the issue is whether reliance by the agent can stand in place of actual reliance by the principal.

¶ 26. ▉▉▉ We need not decide the question of whether an agent's reliance can be imputed to the principal when actual reliance is required because, even if it could, we would not reach that result on the undisputed facts before us. Plaintiffs' closing attorney played a very limited role in ensuring good title and representing plaintiffs at closing. Plaintiffs already had signed the purchase-and-sale agreement when they retained the closing attorney, and thus they were contractually bound to go through with the purchase. There is no evidence in the record that they took any interest in the wastewater disposal system prior to signing the purchase-and-sale agreement or even prior to the closing. Furthermore, there is no evidence that the closing attorney had any responsibility with respect to the quality or sufficiency of the disposal system.

¶ 27. The closing attorney's interest in defendant's certificate was based entirely on his opinion that the existence of defendant's certificate was a requirement of good title under *Bianchi v.*

*Lorenz*, 166 Vt. 555, 701 A.2d 1037 (1997). As plaintiffs stated in their brief, "To remedy the title defect . . . [the closing attorney] asked [D&L's] attorney to provide the § 1973[(a)](3) certificate. The attorney furnished it . . . . With that title defect remedied, the sale was concluded." We can infer in support of plaintiffs' position that the attorney read the certificate to ensure compliance with § 1973(a)(3) but that he had no reason to be concerned about its accuracy or sufficiency as an assessment of the quality of the wastewater disposal system. Indeed plaintiffs already had signed a contract for sale, and there is no evidence that the contract was conditioned on the finality of the disposal system. Even if the attorney's reliance on the certificate could be imputed to plaintiffs, it would be reliance that plaintiffs obtained good title, not reliance sufficient to satisfy § 552.

¶ 28. ▮▮ The dissent parts with our analysis of the attorney's reliance on the certificate. We do not disagree that the attorney's *knowledge* of the certificate is imputed to plaintiffs. But *knowledge* of the certificate cannot substitute for *actual reliance* on the contents of the certificate. Actual reliance, as required under § 552, is a subjective state of mind, focusing on what a plaintiff "considered to be important in deciding to enter into the transaction in which the misrepresentation occurred," *In re Merrill*, No. CC-13-1370-KuPaTa, 2014 WL 1244791, at *7 (B.A.P. 9th Cir.), and actual reliance "occurs when a misrepresentation is an immediate cause of a plaintiff's conduct, which alters [the plaintiff's] legal relations," *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 473 (6th Cir. 2004) (citing *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal. 1997)). Had plaintiffs hired their attorney to advise them on entering into the sale based on the quality of the disposal system, we may have reached a different result. But that was not the case here. Plaintiffs already had entered into the contract and hired the attorney to ensure they were receiving good title. On these facts, we cannot conclude that the quality of the wastewater disposal system was the "immediate cause" of plaintiffs' decision to purchase their home.

¶ 29. We therefore adopt Restatement § 552 as governing claims of negligent misrepresentation but conclude that plaintiffs do not have a valid claim under § 552. The superior court properly granted summary judgment for defendant and properly denied summary judgment for plaintiffs.

¶ 30. We turn next to plaintiffs' claim under the Vermont Consumer Protection Act. The CPA prohibits "unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453(a). Plaintiffs claim relief under the private remedy section of the CPA, which provides, in relevant part, that "[a]ny consumer who contracts for goods or services in reliance upon false or fraudulent representations or practices prohibited by section 2453 of this title, or who sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by section 2453" may recover damages from the "seller, solicitor, or other violator." *Id.* § 2461(b). Plaintiffs have not specified the prong of the private remedy section on which they are relying. We will assume they are not basing their claim on the first prong because it explicitly requires reliance, which, as we concluded with respect to the negligent misrepresentation claim, plaintiffs have not shown.[8] In any event, whichever prong of § 2461(b) we apply, relief is available only if defendant is a "seller, solicitor, or other violator."

¶ 31. ▮▮▮ It is undisputed that defendant is neither a seller nor a solicitor. Thus, plaintiffs can prevail only if defendant is considered an "other violator." This inquiry necessarily involves determining the relationship of the parties and defendant's role in the consumer transaction. The superior court seemingly concluded that defendant could not be an "other violator" because the parties lacked privity at the time of purchase. As plaintiffs point out, however, we have explicitly held that the availability of CPA remedies does not depend on the presence of privity between the plaintiff and defendant. *Elkins v. Microsoft Corp.*, 174 Vt. 328, 331-32, 817 A.2d 9, 13 (2002). Indeed, the Legislature's inclusion of "other violator" in the list of possible defendants is a major reason why it could not have intended to impose a privity requirement.

¶ 32. ▮▮▮ Although we cannot accept the rationale of the superior court on this question, that conclusion does not end our inquiry. We need to examine the relationship between plaintiffs

---

[8] The second prong requires causation and injury, as we recently explained in *Dernier v. Mortgage Network, Inc.*, 2013 VT 96, ¶¶ 57-63, 195 Vt. 113, 87 A.3d 465. We recognize that there is an issue about whether plaintiffs have shown causation, but we prefer to decide whether summary judgment should have been granted to defendant on the CPA claim based on whether defendant could be an "other violator."

and defendant in light of our decisions defining "other violator." We have issued numerous decisions defining and applying "other violator," generally defining the term as a person who is "engaged in an unfair or deceptive commercial practice," and noting that "our focus in determining applicability of the [CPA] is the nature of the alleged violator's activities, not whether the violator falls into a defined statutory category." *Sawyer v. Robson*, 2006 VT 136, ¶ 12, 181 Vt. 216, 915 A.2d 1298.

¶ 33. Our recent decision in *Knutsen v. Dion*, 2013 VT 106, 195 Vt. 512, 90 A.3d 866, which also involved the purchase of a home by the plaintiff, is analogous to this case and most helpful to our decision here. In *Knutsen*, the plaintiff's real estate broker prepared a purchase-and-sale agreement using a form downloaded from the Vermont Association of Realtors' (VAR) website. The form contained provisions limiting the liability of the broker and requiring mediation of any disputes arising out of the contract prior to litigation. After the purchase, the plaintiff experienced water infiltration in the basement and sued her inspector, her broker, the seller, and the seller's real estate agent; she eventually added VAR as a defendant. The plaintiff alleged that VAR violated the CPA by placing the form — which contained unfair provisions — on its website, and that therefore VAR was an "other violator."

¶ 34. Relying on an earlier CPA decision, *State v. Stedman*, 149 Vt. 594, 547 A.2d 1333 (1988), as well as decisions from other jurisdictions, we held that a person could not be liable as an "other violator" unless he or she directly was involved in the transaction that gave rise to liability. *Knutsen*, 2013 VT 106, ¶¶ 19-20. Some of the decisions on which we relied in *Knutsen* present facts more similar to those in this case.

¶ 35. For example, in *Ramapo Brae Condominium Ass'n v. Bergen County Housing Authority*, 746 A.2d 519 (N.J. Super. Ct. App. Div. 2000), purchasers of a condominium development sued the architect who designed the development, alleging design defects. Included was a count for violation of the New Jersey Consumer Protection Act. The court held that the architect could be liable under the Act only if it " 'involved itself as a principal or a retained professional in a real estate marketing venture and permitted its services to be held out as a part of what is being sold.' " *Id.* at 530 (alterations omitted) (quoting *Blatterfein v. Larken Assoc.*, 732 A.2d 555, 564 (N.J. Super. Ct. App. Div.

1999))[9]; see also *Schmidt v. Cornerstone Invs., Inc.*, 795 P.2d 1143, 1151 (Wash. 1990) (en banc) (concluding that, in case where investors in property development alleged violation of Consumer Protection Act based on appraisers' opinion of value, attorney for seller could not be liable under Act because he never interacted with appraisers and never was involved in marketing the property or in soliciting investors).

¶ 36. We also were particularly influenced by two Maryland decisions. In *MRA Property Management, Inc. v. Armstrong*, 43 A.3d 397 (Md. 2012), prospective buyers of condominium units sued the condominium association and its management under the state's Consumer Protection Act for allegedly disclosing inaccurate financial information that influenced the prospective buyers' decisions to purchase the units. The court held that the facts were sufficient to support liability because the defendants directly aided in the sale of the condominium units. *Id.* at 412-13. In reaching this result the court distinguished *Hogan v. Maryland State Dental Ass'n*, 843 A.2d 902 (Md. Ct. Spec. App. 2004), in which dental patients sued national and state dental associations under the Act for allegedly withholding and suppressing information on the toxicity of mercury dental fillings. The *Hogan* court held that the defendants were not liable because there were no allegations that the deceptive trade practice occurred in the sale or offer for sale to the consumer, as required by the Act, even though the

---

[9] In *Blatterfein*, the court concluded that the architect could be liable under the CPA because of the architect's involvement in the sale of the property, stating:

> By their very nature, an architect's professional services typically relate to real estate. Where the question is solely one concerning the quality of those professional services, there may be no adequate basis for asserting liability under the Consumer Fraud Act. But where the architect has involved himself either as a principal or a retained professional in a real estate marketing venture wherein he permits his services to be held out as part of what is being sold, or provided by way of influencing purchasers to enter into contracts, or to maintain contractual relationships, he becomes subject to the Consumer Fraud Act just as every other person involved in inducing the sale or preserving the transaction may be. Based on what has been shown thus far, plaintiffs are entitled to an opportunity to prove that [the architect] engaged in conduct prohibited by the Act and that he is liable under its provisions.

732 A.2d at 564.

defendants took "an active role in controlling" how dentists practiced their profession. *Id.* at 906 (quotation marks omitted).

¶ 37. ▮▮▮ We conclude that this case is controlled by *Knutsen* and its progeny. Although we accept that the completion and filing of defendant's certificate was a prerequisite to D&L's ability to sell the home, the certificate was unrelated to the sale. It was triggered by the need for a wastewater permit, irrespective of who occupied the property. There is no allegation that defendant had any interaction with plaintiffs, and defendant did not supply the permit to plaintiffs or any other prospective purchaser. The law required that it be sent only to the government agency that issued the permit. Furthermore, there is no allegation that the seller used the certificate as part of its sales pitch, and no allegation that defendant had any part in the sales. As we stated above, the Knutsen standard for CPA liability requires that a person be directly involved in the transaction that gives rise to the claimed liability. That standard is not met here.

*Affirmed.*

¶ 38. **Robinson, J.,** dissenting. Because I believe that the majority draws an artificial distinction between the significance of the certifications for marketable title and their significance in verifying that the wastewater system has been inspected and was constructed as designed, and because I do not believe the majority has afforded plaintiffs the benefit of favorable inferences from this summary-judgment record, I respectfully dissent.

¶ 39. I agree with much of the majority's analysis of the law. The majority rightly acknowledges that a claim for negligent misrepresentation does not require privity between the party who supplies false information for the guidance of others in their business transactions and the party who relies on the information. *Ante*, ¶ 18. The majority further acknowledges that the communication that supports a claim of negligent misrepresentation need not be made directly to the person acting in reliance on it. *Ante*, ¶ 19. And the majority acknowledges that plaintiffs clearly fall within the class of people for whose benefit defendant's statutory reporting duty was created. *Ante*, ¶ 16. Accordingly, defendant's duty, as described in Restatement (Second) of Torts § 552(3) (1977) [hereinafter Second Restatement] and Restatement (Third) of Torts: Liability for Economic Harm § 5(3) (Tentative Draft No. 1)

(Apr. 4, 2012) [hereinafter Third Restatement],[10] undisputedly extends to plaintiffs, without regard to whether defendant communicated the information directly to them. But the majority concludes on this summary-judgment record that neither plaintiffs nor the lawyer acting on their behalf relied on the certifications.

¶ 40. My review of this summary-judgment record is informed by two considerations. First, I would conclude that plaintiffs' lawyer's reliance on the certificate, if any, is tantamount to plaintiffs' own reliance.[11] I base this conclusion in part on the broad reach of the "public duty" prong of the negligent-

---

[10] The provisions of the Third Restatement cited in this opinion were approved by the American Law Institute in 2012. 89th Annual Meeting: 2012 Proceedings, *Discussion of Restatement of the Law Third, Torts: Liability for Economic Harm*, 89 A.L.I. Proc. 22, 46-47 (2012). The A.L.I. states that "[o]nce it is approved by the membership at an Annual Meeting, a Tentative Draft . . . represents the most current statement of the American Law Institute's position on the subject and may be cited in opinions or briefs . . . until the official text is published." Am. Law Inst., Overview, Project Development, http://www.ali.org/index.cfm?fuseaction=projects.main.

With slight modifications not relevant here, § 5(3) of the Third Restatement reflects the same principles as § 552 of the Second Restatement. See Third Restatement § 5 cmt. a ("[This section] is based on the logic of Restatement Second, Torts § 552, which a majority of states have adopted. The black letter of this Section, which covers liability for negligent statements, repeats § 552 with small changes.").

In this dissent, I draw upon both of these provisions and their associated comments and illustrations.

[11] Plaintiffs in this case do not claim that they relied on the actions of a state agency or other third party that, in turn, relied on the misrepresentations. See, e.g., *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 403-04 (6th Cir. 1997) (holding that plaintiffs did not allege actual reliance on defendants' misrepresentations — and thus could not rely on § 552 of the Second Restatement — where plaintiffs proffered only "fraud-on-the-market" theory, alleging that defendants' negligent misrepresentations affected market prices, which induced plaintiffs to enter into certain transactions); *Goldman Servs. Mech. Contracting, Inc. v. Citizens Bank & Trust Co.*, 812 F. Supp. 738, 742-43 (W.D. Ky. 1992) (holding that direct reliance was not shown where plaintiffs relied on *third party's* actions which were, in turn, undertaken in reliance on alleged misrepresentation by defendant); *Brinkman v. Barrett Kays & Assocs.*, 575 S.E.2d 40, 44 (N.C. Ct. App. 2003) (holding that plaintiffs did not allege sufficiently direct reliance where allegation was that defendants misrepresented quality of their waste-removal systems in their permit application to state agency; that agency, relying on the misrepresentation, issued the permits; and that, in turn, the plaintiffs relied *on the fact that the agency had issued the permits* to conclude that their waste-disposal system was functioning properly). Rather, plaintiffs claim *direct* reliance on the misrepresentations them-

misrepresentation tort. A comment to the Third Restatement explains: "The negligent defendant is presumptively liable to anyone the statute was meant to protect, and for losses sustained in whatever transactions the statute was meant to cover." Third Restatement § 5 cmt. k. As the majority recognizes, the statute requiring the certificate at issue here was meant to protect plaintiffs in the context of this very type of transaction — purchasing property with a wastewater-disposal system on-site.

¶ 41. Consider the following paradigmatic illustration from the Second Restatement:

> A is negotiating with X Bank for a credit of $50,000. The Bank requires an audit by independent public accountants. A employs B & Company, a firm of accountants, to make the audit, telling them that the purpose of the audit is [to facilitate A's negotiation of a bank loan]. B & Company agrees to make the audit [with no specific understanding of which bank A is negotiating with]. X Bank fails, and A, without any further communication with B & Company, submits its financial statements accompanied by B & Company's opinion to Y Bank, which in reliance upon it extends a credit of $50,000 to A. The audit is so carelessly made as to result in an unqualified favorable opinion on financial statements that materially misstates the financial position of A, and in consequence Y Bank suffers pecuniary loss through its extension of credit. . . . B & Company is subject to liability to Y Bank.

Second Restatement § 552 ill. 7 (a variation of ill. 5, incorporating by reference its fact pattern). The rule of law reflected in this illustration is well-accepted. If Y Bank contracts with outside counsel to perform its due diligence and prepare the loan documents, then Y Bank would not forfeit its tort-law protection against negligent misrepresentation.

¶ 42. Or consider the bean-weigher example relied upon by the majority. *Ante*, ¶ 19 (citing Second Restatement § 552 cmt. g). It posits a bean seller who employs a public weigher to certify the weight of the beans. The weigher prepares a certificate that misstates the weight of the beans. The buyer of the beans has an

selves, which defendant made to plaintiffs' attorney, who was acting on plaintiffs' behalf.

action for negligent misrepresentation against the weigher, even if the weigher gave the certificate to the seller, because "direct communication of the information to the person acting in reliance upon it is not necessary." Second Restatement § 552 cmt. g. If the buyer was a restaurant owner who contracted with a local courier to buy five pounds of beans on the restaurant owner's account and add them to the bean jar in the restaurant kitchen, the restaurant owner would still have a cause of action against the negligent weigher. A contrary suggestion would be squarely at odds with the relatively broad protection for members of the class protected by a statutory reporting requirement that is reflected in § 552(3) of the Second Restatement.

¶ 43. Established law concerning liability for fraudulent misrepresentation further supports my view. Justifiable reliance is an element of a cause of action for fraud. *City of Indus. v. City of Fillmore*, 129 Cal. Rptr. 3d 433, 450 (Ct. App. 2011). Courts have recognized that "[r]eliance by the plaintiff's agent may be imputed to the plaintiff." *Id.*; see also *People v. Zimmerman*, 615 N.E.2d 1008, 1009 (N.Y. 1993) (mem.) ("reliance of its agents may be imputed to the victimized bank"). The Third Restatement discusses the relationship between the torts of fraudulent misrepresentation and negligent misrepresentation:

> Negligent misrepresentation is a cause of action distinct from ordinary negligence and from fraud, but including elements of both. The resemblance to a fraud claim arises from the common requirement that the defendant utter a false statement on which the plaintiff was meant to rely and did rely. But a claim of negligent misrepresentation differs from a claim of fraud because it does not require proof of an intent to deceive. The law therefore provides less generous remedies and takes a more conservative view of the defendant's scope of liability. In other respects, a claim of negligent misrepresentation resembles an ordinary claim of negligence. The standard of care is the familiar test of reasonableness. Unlike a typical action for negligence, however, a claim for negligent misrepresentation is not founded on a general duty to all who might be harmed by the defendant's acts. The duty runs only to particular classes of victims for particular purposes.

Third Restatement § 5, Reporter's Note. Significantly, the Reporter's Note acknowledges that both fraudulent misrepresentation and negligent misrepresentation require reliance. In explaining the narrower reach of the negligent-misrepresentation tort, the Reporter's Note focuses entirely on the scope of the *duty* in question; it says nothing to suggest that the definition of reliance is different when the reliance is on a negligent, as opposed to a fraudulent, misrepresentation. Nor does the logic of the two related torts support different definitions of reliance.

¶ 44. This view is also consistent with the well-established general rule in Vermont that the knowledge of an agent is presumed to be communicated to the principal — regardless of whether that knowledge is actually communicated. See, e.g., *Agency of Natural Res. v. Towns*, 168 Vt. 449, 453, 724 A.2d 1022, 1024 (1998) (" '[N]otice to an agent is notice to the principal . . . regardless of whether the agent actually communicated [the] knowledge' to the principal. Furthermore, because the relationship between attorney and client is that of agent and principal, notice or information conveyed to an attorney will be imputed to the client.") (quoting *Solomon v. Design Dev., Inc.*, 143 Vt. 128, 131, 465 A.2d 234, 236 (1983)); *Carter v. Gugliuzzi*, 168 Vt. 48, 54, 716 A.2d 17, 22 (1998) ("A fundamental tenet of agency law holds that 'the knowledge of an agent acting within the scope of his or her authority is chargeable to the principal, regardless of whether that knowledge is actually communicated.' " (quoting *Estate of Sawyer v. Crowell*, 151 Vt. 287, 291, 559 A.2d 687, 690 (1989))).

¶ 45. The majority does not reach this question because it resolves the case on the basis of a distinct, though related, consideration. Because the principles noted above inform my review of the summary-judgment record in this case, and because I would not affirm on this point, I do address the issue.

¶ 46. The second consideration informing my view in this appeal is the well-accepted rule that in reviewing an order granting summary judgment, we draw all inferences from the information in the record in favor of the nonmoving party. See, e.g., *Collins v. Thomas*, 2007 VT 92, ¶ 6, 182 Vt. 250, 938 A.2d 1208 ("We review an award of summary judgment de novo, construing all doubts and inferences in favor of the nonmoving party."). "If the evidence presented on a motion for summary judgment is subject to conflicting interpretations, or reasonable people might disagree as to its significance, summary judgment is improper." *PH W. Dover*

*Prop., LLC v. Lalancette Eng'rs*, 2015 VT 48, ¶ 31, 199 Vt. 1, 120 A.3d 1135 (Dooley, J., dissenting) (quotation omitted).

¶ 47. With these considerations in mind, I consider the following record evidence.[12] Plaintiffs submitted an affidavit by an expert attorney who reviewed the records of the lawyer who represented plaintiffs in the underlying purchase. Those records include a title report by that lawyer noting that the applicable state wastewater permit requires a certificate from the designer or installer filed with the District Environmental Office certifying completion of the water and sewage conditions; a fax cover sheet from the seller's lawyer to plaintiffs' lawyer attaching the certificate; and the certificate itself. Plaintiffs' expert opined that a competent title attorney would not have advised a client to purchase real estate for residential use that was served by an on-site wastewater-disposal system without having such a certificate.

¶ 48. The majority concludes that as a matter of law plaintiffs have not provided sufficient evidence to show reliance. The majority reasons that the only purpose for which plaintiffs' lawyer considered the certification was to determine the marketability of seller's title. The suggestion is that the lawyer did not care at all about the *truth* of the representations in the certificate, but instead was concerned only about the *existence* of the representations in the certificate. The majority's argument has to be that if defendant had informed plaintiffs' lawyer that the statements in the certificate were inaccurate, the lawyer would not have done anything different. Because the existence of the representations was all that was required to ensure marketable title, the lawyer would have simply certified title and advised the plaintiffs to move forward with the sale.

¶ 49. This suggestion defies common sense. And it ignores the fact — acknowledged by the majority — that the permitting process, and the certification requirement in particular, are designed for plaintiffs' protection in a situation just like this. Purchasers of property with new wastewater systems, and the lawyers representing them, are squarely within the class of people for whose benefit the certification requirement exists. To say that the lawyer's reliance on the certification does not count because

---

[12] Defendant objected to plaintiffs' submission of the evidence in question in connection with its reply in the summary-judgment briefing below. After ruling on the merits of the cross-motions for summary judgment, the trial court dismissed the motion as moot.

the lawyer's assigned task was to evaluate the marketability of title draws an artificial distinction between the significance of *the* certification for marketability and its significance in reassuring a prospective buyer that the newly constructed wastewater system has been duly inspected for compliance with the permitted design. This case involves the most common circumstance in which a person within the class protected by the principles reflected in § 552(3) of the Second Restatement is going to seek out and rely on the certification required by Vermont's wastewater-system permitting scheme. Most purchasers of property do rely on lawyers to advise them, and protect their interests, in connection with the transaction. To suggest that because the lawyer's immediate task is evaluating the marketability of title, the lawyer is unconcerned with and does not rely on the truth of representations on which the marketability determination rests, is to ignore the reasons underlying § 552(3) in the first place.

¶ 50. We can easily infer from this record that the lawyer sought the certificate in order to complete his analysis of the marketability of the seller's title. But I do not believe that we can infer as a matter of law that the lawyer, acting on plaintiffs' behalf, did not rely on the accuracy of the representations, or that the truth of the statements in the certificate was immaterial to the lawyer's actions. If the lawyer had known the statements were inaccurate, and for purposes of this summary-judgment motion we assume that they were, a factfinder could most certainly infer that the lawyer would not have advised the plaintiffs to proceed without taking further steps to ensure that the wastewater system was properly constructed. By inferring as a matter of law that the truth of the statements in the certificate was of no consequence to plaintiffs' lawyer — who had a fiduciary duty to them in connection with this transaction — the majority has failed to draw reasonable inferences in favor of the nonmoving party.[13]

¶ 51. For the above reasons, I dissent. I would reverse the judgment of the trial court.

---

[13] The majority also cites the fact that the plaintiffs had already signed a contract for sale, and states that there is no evidence that the contract was conditioned on the finality of the wastewater-disposal system. *Ante,* ¶ 27. Such sales are generally contingent on marketable title, and often on satisfactory inspection. If the majority is implying that plaintiffs were obligated to go through with the purchase even in the absence of a certificate completing the wastewater-permitting process, even without marketable title, or even in the face of a demonstrated departure from the approved design in the construction of the wastewater-disposal system, there is

simply no basis in the record to support that claim. If anything, it flies in the face of common experience.