2015 VT 77












Glassford v. Dufresne &
Associates, P.C. (2014-194)

 

2015 VT 77

 

[Filed 12-Jun-2015]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 
 
 2015 VT 77
 
 


 


 
 
 No. 2014-194
 
 


 


 
 
 James Glassford and Heidi
 Glassford 
 
 
 Supreme Court
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
 On Appeal from
 
 
 
 
      v.
 
 
 Superior Court, Washington Unit,
 
 
 
 
  
 
 
 Civil Division
 
 
 
 
  
 
 
  
 
 
 
 
 Dufresne & Associates, P.C.
 
 
 November Term, 2014
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 
 
 Helen
 M. Toor, J.
 
 
 
 
  
 
 


Kimberly B. Cheney of Cheney, Saudek & Grayck PC,
Montpelier, for Plaintiffs-Appellants.

 

Philip C. Woodward of Woodward & Kelley, PLLC, South Burlington,
for Defendant-Appellee.

 

 

PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and
Eaton, JJ.

 

 

¶ 1.            
DOOLEY, J.   Plaintiffs Heidi and James Glassford
appeal the decision of the Washington Superior Court denying summary judgment to
plaintiffs and granting summary judgment to defendant Dufresne &
Associates, P.C. on plaintiffs’ claims of negligent misrepresentation and
violation of the Vermont Consumer Protection Act (CPA).  We affirm.

¶ 2.            
The following facts are undisputed.  Plaintiffs are homeowners who
purchased their home direct from the builder, D&L Homes by Design, LLC
(D&L).  D&L hired defendant to certify that the on-site mound
sewage disposal system constructed for the home satisfied state permitting
requirements.  This certification was made pursuant to 10 V.S.A.
§ 1973, which requires a permit for “constructing, replacing, or modifying
a potable water supply or wastewater system,” id. § 1973(a)(3), and
imposes the certification requirement as follows:

  (e) No permit issued by the
Secretary shall be valid for a substantially completed potable water supply and
wastewater system until the Secretary receives a statement from an installer or
licensed designer certifying that, in the exercise of his or her reasonable
professional judgment, the installation-related information submitted is true
and correct and the potable water supply and wastewater system:

  (1) were installed in accordance
with:

  (A) the permitted design and all
permit conditions; or

  (B) record drawings and such
record drawings are in compliance with the applicable rules, were filed with
the Secretary, and are in accordance with all other permit conditions;

  (2) were inspected;

  (3) were properly tested; and

  (4) have successfully met those
performance tests.

Id. § 1973(e).

¶ 3.            
As the language of the statute makes clear, this is a post-permit
requirement that must be completed before the permit becomes effective. 
The statute does not require that the certification be recorded in the land
records, and it provides no private remedy against an installer or licensed
designer who made inaccurate representations in the statement.  The
Secretary of Natural Resources is authorized to take certain enforcement
actions with respect to § 1973.

¶ 4.            
On April 19, 2005, the Vermont Agency of Natural Resources issued a
Wastewater System and Potable Water Supply Permit for construction of the
sewage disposal system on the property, subject to receiving a certification
pursuant to § 1973(e).  On October 20, 2005, defendant’s employee
sent to the Agency the certification required by § 1973(e), stating as
follows: “I hereby certify that, in the exercise of my reasonable professional
judgment, the installation-related information submitted is true and correct
and the wastewater system was installed in accordance with the permitted design
and all permit conditions, was inspected, was properly tested, and has
successfully met those performance tests.”  Defendant’s certification was
for the Agency’s use in determining whether the system was installed according
to the permitted design.[1] 
On November 4, 2005, the Agency wrote defendant stating that “all conditions
pertaining to . . . [the] permit have been satisfied.”

¶ 5.            
On December 20, 2005, plaintiffs signed a purchase-and-sale agreement to
purchase the home from D&L.  Although the seller represented that the
home and property had received all the necessary permits, plaintiffs never saw
the certificate or the letter from the Agency stating that the certification
requirement was satisfied.  Sometime thereafter, plaintiffs hired an
attorney in connection with the closing, which occurred on January 17,
2006.  On January 13, just prior to the closing, plaintiffs’ attorney
prepared a certificate of title that noted the wastewater and water supply
permit and stated: “The permit requires a certificate from the designer or
installer filed with [the] District Environmental Office certifying completion of
the water and sewage conditions.”  The title certificate was provided to
plaintiffs and was not thereafter amended.  Correspondence between
plaintiffs’ attorney and the attorney for the seller included a request for a
copy of the water and sewage certificate, and a copy was included in a FAX from
January 12.  In an affidavit, plaintiff Heidi Glassford stated, “We would
not have purchased the property if Attorney Palmisano had warned us that the
certificate was missing and might be a cause of concern about our title to the
property, or the proper construction of the waste water system.” 
Plaintiffs never saw the certificate until after the sewage disposal system
failed.

¶ 6.            
In February 2006, the sewage disposal system failed.  In November
2008, plaintiffs hired defendant to investigate the system’s failure because
they knew defendant had inspected the system prior to their purchase. 
Defendant prepared a report stating that he had “completed the original”
inspection in 2005 and found the system had been installed according to the
permitted design.  Plaintiffs received other opinions about the disposal
system’s failure both before and after hiring defendant to inspect the system.[2]  In general, plaintiffs’ position is
that the sewage disposal system failed because the soil placed over the system
was improperly graded.[3] 
Defendant’s position is that the system failed because the house was too large,
plaintiffs operated a daycare center that added to the wastewater entering the
system, and plaintiffs’ horses were allowed to walk over the system.

¶ 7.            
Plaintiffs filed a complaint in superior court alleging pecuniary losses
from defendant’s failure to properly inspect the sewage disposal system and
subsequent misrepresentation about the construction of the system in the
certification to the Agency.[4] 
Specifically, they alleged damages in tort for negligence—which, as discussed
below, the superior court defined as a negligent misrepresentation claim—and
under the CPA.  Both parties moved for summary judgment, and the court
entered judgment for defendant on both claims.

¶ 8.            
As related to this appeal, the superior court held that plaintiffs’
negligent misrepresentation claim failed because plaintiffs did not see
defendant’s certification until the proceedings in this case and therefore did
not rely on the alleged misrepresentation.  With respect to the CPA claim,
the court held that the claim failed because the parties did not contract for a
sale of goods or services as required under the CPA.  Plaintiffs appealed.

¶ 9.            
On appeal, plaintiffs argue that, with respect to the negligent
misrepresentation claim, the superior court erred in finding that they did not
rely on the certificate.  They contend that defendant was under a public
duty to furnish this information and that therefore they fall within the class
of plaintiffs sought to be protected by the public duty.  They further
contend that, although they never saw the certificate prior to their purchase,
they relied on it through their agent attorney, whose knowledge of the
certificate was imputed to plaintiffs.  They also argue that the superior
court erred in concluding that the CPA requires privity between the parties and
instead should have held defendant liable as an indirect seller.  We
disagree with plaintiffs and affirm the superior court’s grant of summary
judgment for defendant.

¶ 10.        
We review summary judgment decisions de novo under the same standard as
the trial court.  Stone v. Town of Irasburg, 2014 VT 43, ¶ 25,
196 Vt. 356, 98 A.3d 769.  Summary judgment will be granted when, viewing
the evidence in the light most favorable to the nonmoving party, “there is no
genuine dispute as to any material fact and the moving party is entitled to
judgment as a matter of law.”  Id.; see V.R.C.P. 56(a).

¶ 11.        
Before turning to plaintiffs’ claims, we emphasize what we are deciding
under this standard of review.  As noted in the footnotes above, defendant
disputes several facts critical to plaintiffs’ claims, and the absence of these
material facts—facts that link defendant to the failure of the sewage disposal
system—defeats plaintiffs’ summary judgment motion.  Assuming without
deciding that plaintiffs’ version of the disposal system’s failure is
undisputed, we still conclude that plaintiffs’ claims of negligent
misrepresentation and violation of the CPA fail before even reaching the
causation issue.  The superior court did not need to consider that issue
in its decision, and neither do we.

¶ 12.        
We start with plaintiffs’ claim of negligent misrepresentation.  As
noted above, plaintiffs claim only economic losses, which usually are precluded
in a tort action.  Long Trail House Condo. Ass’n v. Engelberth Constr.,
Inc., 2012 VT 80, ¶ 10, 192 Vt. 322, 59 A.3d 752.  Plaintiffs
argued below that their case fits into an exception to the economic loss rule
where a special relationship exists between the parties, particularly in the
context of professional malpractice.  According to plaintiffs, that
special relationship was created by defendant’s statutory duty to file a
certificate with the Agency.  The superior court found the proper
framework for plaintiffs’ claim under the common law tort of negligent
misrepresentation, as defined in Restatement (Second) of Torts § 552
(1977) [hereinafter the Restatement], which provides a cause of action for
“information negligently supplied for the guidance of others.”  We
previously have adopted this section of the Restatement for claims of negligent
misrepresentation, Limoge v. People’s Trust Co., 168 Vt. 265, 268, 719
A.2d 888, 890 (1998), and do so here.

¶ 13.        
Section 552 of the Restatement provides:

  (1) One who, in the course of his
business, profession or employment, or in any other transaction in which he has
a pecuniary interest, supplies false information for the guidance of others in
their business transactions, is subject to liability for pecuniary loss caused
to them by their justifiable reliance on the information.

  (2) Except as stated in Subsection
(3), the liability stated in Subsection (1) is limited to loss suffered (a) by
the person or one of a limited group of persons for whose benefit and guidance
he intends to supply the information or knows that the recipient intends to
supply it; and (b) through reliance upon it in a transaction that he intends
the information to influence or knows that the recipient so intends or in a
substantially similar transaction.

  (3) The liability of one who is
under a public duty to give the information extends to loss suffered by any of
the class of persons for whose benefit the duty is created, in any of the
transactions in which it is intended to protect them.

¶ 14.        
The central questions in our inquiry under the Restatement are whether
plaintiffs fall within the class protected by the section and, if so, whether
they relied on the statements made by defendant in its certification.  We
start with subsection (2), which limits a defendant’s liability under
§ 552 to specific plaintiffs and transactions.  As highlighted in the
comments and illustrations, liability under subsection (2) attaches “only to
those persons for whose benefit and guidance it is supplied.”  Restatement
§ 552 cmt. h.  This liability is narrower than liability for fraudulent
misrepresentation under Restatement § 531, which attaches when a
plaintiff’s reliance on the misrepresentation is reasonably foreseeable. 
As explained in comment h, the intended recipient of information under
§ 552(2) need not be identifiable to the defendant as a potential 
plaintiff at the time the information is disseminated, but rather, the
defendant must intend the information “to reach and influence either a particular
person or persons, known to him, or a group or class of persons, distinct from
the much larger class who might reasonably be expected sooner or later to
access the information and foreseeably take some action in reliance on
it.”  Id.  In other words, it is not sufficient that the
defendant “merely knows of the ever-present possibility of repetition to
anyone, and the possibility of action in reliance upon it, on the part of
anyone to whom it may be repeated.”  Id.

¶ 15.        
Turning to the facts here, plaintiffs were not the intended recipient of
the certificate.  The certificate was provided to the Agency for
determining compliance with the permitted design and was not intended for use
by homebuyers in deciding whether or not to effect a purchase.  That
homebuyers, like plaintiffs, may at some point obtain the information is merely
incidental and does not create a cause of action under subsection (2).

¶ 16.        
Concluding that plaintiffs have no claim under § 552(2), we turn to
subsection (3), an exception to the limits on liability defined in
subsection (2) for defendants that have a duty to provide information for the
benefit of the public.  This includes private individuals or entities
under a statutory duty to supply information.  Restatement § 552 cmt.
k.  For example, if a notary public negligently acknowledges a signature
on a deed that turns out to be a forgery and a purchaser relies on the recorded
deed in purchasing land, the notary is liable to the purchaser for any pecuniary
losses as a result of the invalid deed.  Id. illus. 16 (citing Mulroy
v. Wright, 240 N.W. 116, 116-19 (Minn. 1931)).  As made clear by this
and other illustrations under comment k, subsection (3) removes the limitation
of subsection (2) that narrows the class of potential plaintiffs, and instead
subjects the defendant to liability for losses “to any of the class of persons
for whose benefit the duty is created.”  Id. § 552 cmt. k.
 Here, defendant’s duty is derived from 10 V.S.A. § 1973, and
plaintiffs clearly fall within the class of persons—those purchasing a newly
constructed wastewater disposal system—for whose benefit this statutory duty
was created.[5] 
Nonetheless, as explained in the following analysis, plaintiffs’ claim still
fails under subsection (3) because plaintiffs demonstrated no actual, or
direct, reliance[6]
on the certificate.

¶ 17.        
Although the superior court never explicitly stated which provision of
§ 552 it was applying in its analysis, it concluded that plaintiffs’ claim
failed for lack of direct reliance.  Direct reliance is required under
§ 552(1) and also applies to claims under §§ 552(2) and (3). 
Plaintiffs, however, misread the court’s discussion of direct reliance and
confuse the concept of direct reliance with direct communication. 
They attempt to undercut the court’s analysis on direct reliance by citing
several cases involving competitive bidding on construction projects, all of
which highlight the notion that indirect communication is sufficient.  For
example, in Bilt-Rite Contractors, Inc. v. Architectural Studio, 866
A.2d 270 (Pa. 2005), the building contractor relied on the plans of the
architecture firm when bidding on a school construction project.  The Pennsylvania
Supreme Court observed that § 552 does not require privity between the
parties, such that the information need not be conveyed directly from the firm
to the contractor, and cited several cases from other state courts that have
drawn similar conclusions.  Id. at 284-86.  

¶ 18.        
What Bilt-Rite and the other competitive bidding cases have in
common, however, is that the contractors directly relied on the plans in
making their bids, even though the firms that prepared the plans did not directly
submit their plans to the bidders.  As the court in Bilt-Rite
noted, eliminating the need for privity in such cases is supported by the
reality of “modern businesses” that one party frequently relies upon the
guidance of others possessing specialized expertise, even though no direct
contractual relationship exists.  Id. at 286.  While
eliminating the privity requirement supports the policy of fairness and
accountability in business dealings, the element of reliance remains key.

¶ 19.        
The comments to § 552 indicate a distinction between direct
communication and direct reliance.  As explained, “direct communication of
the information to the person acting in reliance is not necessary.” 
Restatement § 552 cmt. g.  For example, if a vendor of beans employs
a public weigher who prepares a certificate that misstates the weight of the
beans, it does not matter whether the weigher conveys the certificate directly
to the vendee or gives it to the vendor who, in turn, conveys the information
to the vendee.  Id.  The method by which the vendee receives
the information does not affect the weigher’s liability, but what is important
is that the vendee received the information and was able to directly rely
on that information before making the purchase.  Analogizing this
illustration to the facts here, it does not matter that defendant furnished the
certificate to the Agency and not directly to plaintiffs; what matters is
whether plaintiffs themselves relied on that certification firsthand.

¶ 20.        
In expressly invoking the public duty exception on appeal, plaintiffs
assert that “this Court need not concern itself with ‘indirect’ liability
because the general public is the beneficiary of the certification, and its
members are presumed to have relied on it.”  Contrary to plaintiffs’
assertion, the broadened liability under the public duty exception does not
eliminate this need for direct reliance.  As discussed above, the public
duty exception merely enlarges the class of potential plaintiffs.  While the
potential plaintiffs are presumed to have benefitted from the public duty,
there is no presumption of reliance.

¶ 21.        
On point here is Brinkman v. Barrett Kays & Assocs., 575
S.E.2d 40 (N.C. Ct. App. 2003), which illustrates the need for actual reliance
under the public duty exception.  Factually, this case is quite
similar.  The plaintiffs in Brinkman all purchased newly
constructed homes outfitted with waste removal systems designed by the
defendants.  The plaintiffs alleged that the defendants misrepresented the
quality of the disposal systems to the Department of Environmental &
Natural Resources in securing their permits for the systems and that, in turn,
the plaintiffs relied on those permits in purchasing their homes.  The
North Carolina Court of Appeals turned to precedent of the state’s high court
holding that § 552 requires actual reliance.  Id. at 44
(citing Raritan River Steel Co. v. Cherry, Bekaert & Holland, 367
S.E.2d 609, 612 (N.C. 1988)).  The court concluded:

  There is no evidence in the case
at bar supporting the conclusion that there was actual reliance by plaintiffs
upon defendants’ statements.  The statements were made to the department,
which relied upon them and issued permits to defendants.  Plaintiffs
relied upon the department to fully investigate defendants’ application for
permits.  Plaintiffs relied upon the original permits and the re-issuance
of the permits to conclude that their waste disposal system was functioning
correctly. . . .  However, there is no evidence that
plaintiffs relied upon the statements made by defendants as required by
Restatement § 552(1).

Id.  The court held
that because there was no evidence of the “essential element of reliance,” the
plaintiffs’ claim under the public duty exception fails.  Id.

¶ 22.        
Restatement § 552 requires “justifiable reliance” but never
expressly defines the scope of that reliance.  The courts largely have
followed reasoning similar to that of North Carolina and have held that a
negligent misrepresentation claim requires a plaintiff to rely directly on the
defendant’s misrepresentations and not on a third party’s reliance on such
information.  See, e.g., In re Sofamor Danek Grp., Inc., 123 F.3d
394, 404 (6th Cir. 1997) (“The majority of federal
courts . . . have held that § 552 of the Restatement
requires actual reliance before a party may be liable for negligent
misrepresentation.”); Goldman Servs. Mech. Contracting, Inc. v. Citizens
Bank & Trust Co., 812 F. Supp. 738, 742-43 (W.D. Ky. 1992) (finding no
actionable negligent misrepresentation claim where plaintiffs did not rely
directly on false information in financial statements but rather relied on
third party’s reliance on that information in signing certificate of
sufficiency qualifying surety for payment bonds); White v. BDO Seidman, LLP,
549 S.E.2d 490, 493-94 (Ga. Ct. App. 2001) (rejecting indirect
“fraud-on-the-market”[7] reliance as
inapplicable to common law negligent misrepresentation claims, which require
actual reliance); Cahill v. E. Benefit Sys., Inc., 603 N.E.2d 788, 792
(Ill. App. Ct. 1992) (concluding that employee did not show actual reliance
because it was employer’s insurer, and not employee, who relied on
misrepresentation of medical review organization); Knights of Columbus
Council 3152 v. KFS BD, Inc., 791 N.W.2d 317, 328-31 (Neb. 2010) (declining
to extend defendant’s liability under public duty exception where plaintiffs
did not rely directly on false information but merely on consequences of that
information); Va. Oak Venture, LLC v. Fought, 448 S.W.3d 179, 186-87
(Tex. App. 2014) (concluding that purchaser did not show “actual and
justifiable reliance” because she relied on lenders’ reliance on appraisal and
never saw appraisal until after purchase, and stating that “[s]tretching
reliance through another party in that fashion is not supported by the law”).

¶ 23.        
As the above-cited cases illustrate, it is not the nature of the
communication that impacts the viability of a negligent misrepresentation claim,
nor is it sufficient that a plaintiff detrimentally changes his or her position
as a consequence of the false information.  The necessary piece in this
puzzle is that the plaintiff actually received or was made aware of the false
statements and directly relied on those false statements.  See Knights
of Columbus, 791 N.W.2d at 326-28, 331 (explaining that even where
third-party communication is acceptable for negligent misrepresentation claim,
plaintiffs must still show that they received and were made aware of
misrepresentation, even under broadened § 552(3) liability).

¶ 24.        
Here, plaintiffs acknowledged that they never actually viewed the
certificate.  Rather, their attorney viewed the certificate and prepared
the title report, and plaintiffs relied on the marketability of the title in
their decision to close on the transfer of title to their home.  This
indirect reliance is insufficient to render defendant liable for its allegedly
false information.  The Agency relied on the certificate, and plaintiffs’
attorney relied on the certificate in ensuring the marketability of the title,
but plaintiffs neither received nor were made aware of the certificate until
long after their home purchase.

¶ 25.        
Plaintiffs argue that even if § 552 does require actual reliance,
they satisfied that element because their attorney, acting as their agent,
directly relied on the certificate in preparing the title report, and his
reliance was imputed to plaintiffs.  Plaintiffs support their argument
with the background principles of agency law, whereby an agent’s knowledge is
imputed to the principal, Mann v. Adventure Quest, Inc., 2009 VT 38,
¶ 11, 186 Vt. 14, 974 A.2d 607, but the issue is whether reliance by the
agent can stand in place of actual reliance by the principal.  

¶ 26.        
We need not decide the question of whether an agent’s reliance can be
imputed to the principal when actual reliance is required because, even if it
could, we would not reach that result on the undisputed facts before us. 
Plaintiffs’ closing attorney played a very limited role in ensuring good title
and representing plaintiffs at closing.  Plaintiffs already had signed the
purchase-and-sale agreement when they retained the closing attorney, and thus
they were contractually bound to go through with the purchase.  There is
no evidence in the record that they took any interest in the wastewater
disposal system prior to signing the purchase-and-sale agreement or even prior
to the closing.  Furthermore, there is no evidence that the closing
attorney had any responsibility with respect to the quality or sufficiency of
the disposal system.

¶ 27.        
The closing attorney’s interest in defendant’s certificate was based entirely
on his opinion that the existence of defendant’s certificate was a requirement
of good title under Bianchi v. Lorenz, 166 Vt. 555, 701 A.2d 1037
(1997).  As plaintiffs stated in their brief, “To remedy the title
defect . . . [the closing attorney] asked [D&L’s]
attorney to provide the § 1973[(a)](3) certificate.  The attorney
furnished it . . . .  With that title defect
remedied, the sale was concluded.”  We can infer in support of plaintiffs’
position that the attorney read the certificate to ensure compliance with
§ 1973(a)(3) but that he had no reason to be concerned about its accuracy
or sufficiency as an assessment of the quality of the wastewater disposal
system.  Indeed plaintiffs already had signed a contract for sale, and
there is no evidence that the contract was conditioned on the finality of the
disposal system.  Even if the attorney’s reliance on the certificate could
be imputed to plaintiffs, it would be reliance that plaintiffs obtained good
title, not reliance sufficient to satisfy § 552.

¶ 28.        
The dissent parts with our analysis of the attorney’s reliance on the
certificate.  We do not disagree that the attorney’s knowledge of
the certificate is imputed to plaintiffs.  But knowledge of the
certificate cannot substitute for actual reliance on the contents of the
certificate.  Actual reliance, as required under § 552, is a
subjective state of mind, focusing on what a plaintiff “considered to be
important in deciding to enter into the transaction in which the
misrepresentation occurred,” In re Merrill, No. CC-13-1370-KuPaTa, 2014
WL 1244791, at *7 (B.A.P. 9th Cir.), and actual reliance “occurs when a
misrepresentation is an immediate cause of a plaintiff’s conduct, which alters
[the plaintiff’s] legal relations,” Am. Trim, LLC v. Oracle Corp., 383
F.3d 462, 473 (6th Cir. 2004) (citing Engalla v. Permanente Med. Grp., Inc.,
938 P.2d 903, 919 (Cal. 1997).  Had plaintiffs hired their attorney to
advise them on entering into the sale based on the quality of the disposal
system, we may have reached a different result.  But that was not the case
here.  Plaintiffs already had entered into the contract and hired the
attorney to ensure they were receiving good title.  On these facts, we
cannot conclude that the quality of the wastewater disposal system was the
“immediate cause” of plaintiffs’ decision to purchase their home.

¶ 29.        
We therefore adopt Restatement § 552 as governing claims of
negligent misrepresentation but conclude that plaintiffs do not have a valid
claim under § 552.  The superior court properly granted summary
judgment for defendant and properly denied summary judgment for plaintiffs.

¶ 30.        
We turn next to plaintiffs’ claim under the Vermont Consumer Protection
Act.  The CPA prohibits “unfair or deceptive acts or practices in
commerce.”  9 V.S.A. § 2453(a).  Plaintiffs claim relief under
the private remedy section of the CPA, which provides, in relevant part, that
“[a]ny consumer who contracts for goods or services in reliance upon false or
fraudulent representations or practices prohibited by section 2453 of this
title, or who sustains damages or injury as a result of any false or fraudulent
representations or practices prohibited by section 2453” may recover damages
from the “seller, solicitor, or other violator.”  Id.
§ 2461(b).  Plaintiffs have not specified the prong of the private
remedy section on which they are relying.  We will assume they are not
basing their claim on the first prong because it explicitly requires reliance,
which, as we concluded with respect to the negligent misrepresentation claim,
plaintiffs have not shown.[8] 
In any event, whichever prong of § 2461(b) we apply, relief is available
only if defendant is a “seller, solicitor, or other violator.”

¶ 31.        
It is undisputed that defendant is neither a seller nor a
solicitor.  Thus, plaintiffs can prevail only if defendant is considered
an “other violator.”  This inquiry necessarily involves determining the
relationship of the parties and defendant’s role in the consumer
transaction.  The superior court seemingly concluded that defendant could
not be an “other violator” because the parties lacked privity at the time of
purchase.  As plaintiffs point out, however, we have explicitly held that the
availability of CPA remedies does not depend on the presence of privity between
the plaintiff and defendant.  Elkins v. Microsoft Corp., 174 Vt.
328, 331-32, 817 A.2d 9, 13 (2002).  Indeed, the Legislature’s inclusion
of “other violator” in the list of possible defendants is a major reason why it
could not have intended to impose a privity requirement.

¶ 32.        
Although we cannot accept the rationale of the superior court on this
question, that conclusion does not end our inquiry.  We need to examine
the relationship between plaintiffs and defendant in light of our decisions
defining “other violator.”  We have issued numerous decisions defining and
applying “other violator,” generally defining the term as a person who is
“engaged in an unfair and deceptive commercial practice,” and noting that “our
focus in determining applicability of the [CPA] is the nature of the alleged
violator’s activities, not whether the violator falls into a defined statutory
category.”  Sawyer v. Robson, 2006 VT 136, ¶ 12, 181 Vt. 216,
915 A.2d 1298.

¶ 33.        
Our recent decision in Knutsen v. Dion, 2013 VT 106, 195 Vt. 512,
90 A.3d 866, which also involved the purchase of a home by the plaintiff, is
analogous to this case and most helpful to our decision here.  In Knutsen,
the plaintiff’s real estate broker prepared a purchase-and-sale agreement using
a form downloaded from the Vermont Association of Realtors’ (VAR)
website.  The form contained provisions limiting the liability of the
broker and requiring mediation of any disputes arising out of the contract
prior to litigation.  After the purchase, the plaintiff experienced water
infiltration in the basement and sued her inspector, her broker, the seller,
and the seller’s real estate agent; she eventually added VAR as a defendant. 
The plaintiff alleged that VAR violated the CPA by placing the form—which
contained unfair provisions—on its website, and that therefore VAR was an
“other violator.”

¶ 34.        
Relying on an earlier CPA decision, State v. Stedman, 149 Vt. 594,
547 A.2d 1333 (1988), as well as decisions from other jurisdictions, we held
that a person could not be liable as an “other violator” unless he or she
directly was involved in the transaction that gave rise to liability.  Knutsen,
2013 VT 106, ¶¶ 19-20.  Some of the decisions on which we relied in Knutsen
present facts more similar to those in this case.

¶ 35.        
For example, in Ramapo Brae Condominium Ass’n v. Bergen County
Housing Authority, 746 A.2d 519 (N.J. Super. Ct. App. Div. 2000), purchasers
of a condominium development sued the architect who designed the development,
alleging design defects.  Included was a count for violation of the New
Jersey Consumer Protection Act.  The court held that the architect could
be liable under the Act only if it “ ‘involved itself as a principal or a
retained professional in a real estate marketing venture and permitted its
services to be held out as a part of what is being sold.’ ”  Id.
at 530 (alterations omitted) (quoting Blatterfein v. Larken Assoc., 732
A.2d 555, 564 (N.J. Super. Ct. App. Div. 1999))[9]; see also Schmidt v. Cornerstone
Invs., Inc., 795 P.2d 1143, 1151 (Wash. 1990) (en banc) (concluding that,
in case where investors in property development alleged violation of Consumer
Protection Act based on appraisers’ opinion of value, attorney for seller could
not be liable under Act because he never interacted with appraisers and never
was involved in marketing the property or in soliciting investors).

¶ 36.        
We also were particularly influenced by two Maryland decisions.  In
MRA Property Management, Inc. v. Armstrong, 43 A.3d 397 (Md. 2012),
prospective buyers of condominium units sued the condominium association and
its management under the state’s Consumer Protection Act for allegedly
disclosing inaccurate financial information that influenced the prospective
buyers’ decisions to purchase the units.  The court held that the facts
were sufficient to support liability because the defendants directly aided in
the sale of the condominium units.  Id. at 412-13.  In
reaching this result the court distinguished Hogan v. Maryland State Dental
Ass’n, 843 A.2d 902 (Md. Ct. Spec. App. 2004), in which dental patients
sued national and state dental associations under the Act for allegedly
withholding and suppressing information on the toxicity of mercury dental
fillings.  The Hogan court held that the defendants were not liable
because there were no allegations that the deceptive trade practice occurred in
the sale or offer for sale to the consumer, as required by the Act, even though
the defendants took “an active role in controlling” how dentists practiced
their profession.  Id. at 906 (quotation marks omitted).

¶ 37.        
We conclude that this case is controlled by Knutsen and its
progeny.  Although we accept that the completion and filing of defendant’s
certificate was a prerequisite to D&L’s ability to sell the home, the
certificate was unrelated to the sale.  It was triggered by the need for a
wastewater permit, irrespective of who occupied the property.  There is no
allegation that defendant had any interaction with plaintiffs, and defendant
did not supply the permit to plaintiffs or any other prospective
purchaser.  The law required that it be sent only to the government agency
that issued the permit.  Furthermore, there is no allegation that the
seller used the certificate as part of its sales pitch, and no allegation that
defendant had any part in the sales.  As we stated above, the Knutsen
standard for CPA liability requires that a person be directly involved in the
transaction that gives rise to the claimed liability.  That standard is
not met here.

Affirmed.


 
 
  
 
 
  
 
 
 FOR THE COURT:
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 Associate
 Justice
 
 


 

 

¶ 38.        
ROBINSON, J., dissenting.   Because I believe that the
majority draws an artificial distinction between the significance of the
certifications for marketable title and their significance in verifying that
the wastewater system has been inspected and was constructed as designed, and
because I do not believe the majority has afforded plaintiffs the benefit of
favorable inferences from this summary-judgment record, I respectfully dissent.

¶ 39.        
I agree with much of the majority’s analysis of the law.  The
majority rightly acknowledges that a claim for negligent misrepresentation does
not require privity between the party who supplies false information for the
guidance of others in their business transactions and the party who relies on
the information.  Ante, ¶ 18.  The majority further
acknowledges that the communication that supports a claim of negligent
misrepresentation need not be made directly to the person acting in reliance on
it.  Ante, ¶ 19.  And the majority acknowledges that
plaintiffs clearly fall within the class of people for whose benefit
defendant’s statutory reporting duty was created.  Ante,
¶ 16.  Accordingly, defendant’s duty, as described in Restatement
(Second) of Torts § 552(3) (1965) [hereinafter Second Restatement] and
Restatement (Third) of Torts: Liability for Economic Harm § 5(3)
(Tentative Draft No. 1) (Apr. 4, 2012) [hereinafter Third Restatement],[10] undisputedly extends to plaintiffs,
without regard to whether defendant communicated the information directly to
them.  But the majority concludes on this summary-judgment record that
neither plaintiffs nor the lawyer acting on their behalf relied on the
certifications.

¶ 40.        
My review of this summary-judgment record is informed by two
considerations.  First, I would conclude that plaintiffs’ lawyer’s
reliance on the certificate, if any, is tantamount to plaintiffs’ own reliance.[11]  I base this conclusion in part on
the broad reach of the “public duty” prong of the negligent-misrepresentation
tort.  A comment to the Third Restatement explains: “The negligent defendant is presumptively liable to anyone
the statute was meant to protect, and for losses sustained in whatever
transactions the statute was meant to cover.”  Third Restatement § 5
cmt. k.  As the majority recognizes, the statute requiring the
certificate at issue here was meant to protect plaintiffs in the context of
this very type of transaction—purchasing property with a wastewater-disposal
system on-site.

¶ 41.        
Consider the following paradigmatic illustration from the Second
Restatement:

A is negotiating with X Bank for a credit of $50,000. 
The Bank requires an audit by independent public accountants.  A employs B
& Company, a firm of accountants, to make the audit, telling them that the
purpose of the audit is [to facilitate A’s negotiation of a bank loan].  B
& Company agrees to make the audit [with no specific understanding of which
bank A is negotiating with].  X Bank fails, and A, without any further
communication with B & Company, submits its financial statements
accompanied by B & Company’s opinion to Y Bank, which in reliance upon it
extends a credit of $50,000 to A.  The audit is so carelessly made as to
result in an unqualified favorable opinion on financial statements that
materially misstates the financial position of A, and in consequence Y Bank
suffers pecuniary loss through its extension of credit. . . . B &
Company is subject to liability to Y Bank.

 

Second Restatement § 552 ill.
7 (a variation of ill. 5, incorporating by reference its fact pattern). 
The rule of law reflected in this illustration is well-accepted.  If Y
Bank contracts with outside counsel to perform its due diligence and prepare
the loan documents, then Y Bank would not forfeit its tort-law protection
against negligent misrepresentation.

¶ 42.        
Or consider the bean-weigher example relied upon by the majority.  Ante,
¶ 19 (citing Second Restatement § 552 cmt. g).  It posits a
bean-seller who employs a public weigher to certify the weight of the
beans.  The weigher prepares a certificate that misstates the weight of
the beans.  The buyer of the beans has an action for negligent
misrepresentation against the weigher, even if the weigher gave the certificate
to the seller, because “direct communication of the information to the person
acting in reliance upon it is not necessary.”  Second Restatement § 552
cmt. g.  If the buyer was a restaurant owner who contracted with a local
courier to buy five pounds of beans on the restaurant owner’s account and add
them to the bean jar in the restaurant kitchen, the restaurant owner would
still have a cause of action against the negligent weigher.  A contrary
suggestion would be squarely at odds with the relatively broad protection for
members of the class protected by a statutory reporting requirement that is
reflected in § 552(3) of the Second Restatement.

¶ 43.        
Established law concerning liability for fraudulent misrepresentation
further supports my view.  Justifiable reliance is an element of a cause
of action for fraud.  City of Indus. v. City of Fillmore, 129
Cal. Rptr. 3d 433, 450 (Cal. Ct. App. 2011).  Courts have
recognized that “[r]eliance by the plaintiff’s agent may be imputed to the
plaintiff.”  Id.; see also People v. Zimmerman, 615 N.E.2d
1008, 1009 (N.Y. 1993) (mem.) (“reliance of its agents may be imputed to the
victimized bank”).  The Third Restatement discusses the relationship
between the torts of fraudulent misrepresentation and negligent
misrepresentation:

Negligent misrepresentation is a cause of action distinct
from ordinary negligence and from fraud, but including elements of both. The
resemblance to a fraud claim arises from the common requirement that the
defendant utter a false statement on which the plaintiff was meant to rely and
did rely.  But a claim of negligent misrepresentation differs from a claim
of fraud because it does not require proof of an intent to deceive.  The
law therefore provides less generous remedies and takes a more conservative
view of the defendant’s scope of liability.  In other respects, a claim of
negligent misrepresentation resembles an ordinary claim of negligence. 
The standard of care is the familiar test of reasonableness.  Unlike a
typical action for negligence, however, a claim for negligent misrepresentation
is not founded on a general duty to all who might be harmed by the defendant’s
acts.  The duty runs only to particular classes of victims for particular
purposes.

 

Third
Restatement § 5, Reporter’s Note.  Significantly, the Reporter’s Note
acknowledges that both fraudulent misrepresentation and negligent
misrepresentation require reliance.  In explaining the narrower reach of
the negligent-misrepresentation tort, the Reporter’s Note focuses entirely on
the scope of the duty in question; it says nothing to suggest that the
definition of reliance is different when the reliance is on a negligent, as
opposed to a fraudulent, misrepresentation.  Nor does the logic of the two
related torts support different definitions of reliance.

¶ 44.        
This view is also consistent with the well-established general
rule in Vermont that the knowledge of an agent is presumed to be communicated
to the principal—regardless of whether that knowledge is actually
communicated.  See, e.g., Agency of Natural
Res. v. Towns, 168 Vt. 449, 453, 724 A.2d 1022, 1024 (1998)
(“ ‘[N]otice to an agent is notice to the principal . . .
regardless of whether the agent actually communicated [the] knowledge’ to the
principal.  Furthermore, because the relationship between attorney and
client is that of agent and principal, notice or information conveyed to an
attorney will be imputed to the client.”) (quoting Solomon v. Design Dev.,
Inc., 143 Vt. 128, 131, 465 A.2d 234, 236 (1983)); Carter v. Gugliuzzi,
168 Vt. 48, 54, 716 A.2d 17, 22 (1998) (“A fundamental tenet of agency law
holds that ‘the knowledge of an agent acting within the scope of his or her
authority is chargeable to the principal, regardless of whether that knowledge
is actually communicated.’ ” (quoting Estate of Sawyer v. Crowell,
151 Vt. 287, 291, 559 A.2d 687, 690 (1989))).

¶ 45.        
The majority does not reach this question because it resolves the case
on the basis of a distinct, though related, consideration.  Because the
principles noted above inform my review of the summary-judgment record in this
case, and because I would not affirm on this point, I do address the issue.

¶ 46.         The second consideration informing my view in this appeal is
the well-accepted rule that in reviewing an order granting summary judgment, we
draw all inferences from the information in the record in favor of the
nonmoving party.  See, e.g., Collins v. Thomas, 2007 VT 92,
¶ 6, 182 Vt. 250, 938 A.2d 1208 (“We review an award of summary judgment
de novo, construing all doubts and inferences in favor of the nonmoving
party.”).  “If the evidence presented on a motion for summary judgment is
subject to conflicting interpretations, or reasonable people might disagree as
to its significance, summary judgment is improper.”  PH W. Dover Prop.,
LLC v. Lalancette Eng’rs, 2015 VT 48, ¶ 31, ___ Vt. ___, ___ A.3d ___
(Dooley, J., dissenting) (quotation omitted).

¶ 47.         With
these considerations in mind, I consider the following record evidence.[12]  Plaintiffs submitted an affidavit
by an expert attorney who reviewed the records of the lawyer who represented
plaintiffs in the underlying purchase.  Those records include a title
report by that lawyer noting that the applicable state wastewater permit
requires a certificate from the designer or installer filed with the District
Environmental Office certifying completion of the water and sewage conditions;
a fax cover sheet from the seller’s lawyer to plaintiffs’ lawyer attaching the
certificate; and the certificate itself.  Plaintiffs’ expert opined that a
competent title attorney would not have advised a client to purchase real
estate for residential use that was served by an on-site wastewater-disposal
system without having such a certificate.

¶ 48.         The
majority concludes that as a matter of law plaintiffs have not provided
sufficient evidence to show reliance.  The majority reasons that the only
purpose for which plaintiffs’ lawyer considered the certification was to
determine the marketability of seller’s title.  The suggestion is that the
lawyer did not care at all about the truth of the representations in the
certificate, but instead was concerned only about the existence of the
representations in the certificate.  The majority’s argument has to be
that if defendants had informed plaintiffs’ lawyer that the statements in the
certificate were inaccurate, the lawyer would not have done anything
different.  Because the existence of the representations was all that was
required to ensure marketable title, the lawyer would have simply certified
title and advised the plaintiffs to move forward with the sale.  

¶ 49.         This
suggestion defies common sense.  And it ignores the fact—acknowledged by
the majority—that the permitting process, and the certification requirement in
particular, are designed for plaintiffs’ protection in a situation just like
this.  Purchasers of property with new wastewater systems, and the lawyers
representing them, are squarely within the class of people for whose benefit
the certification requirement exists.  To say that the lawyer’s reliance
on the certification does not count because the lawyer’s assigned task was to
evaluate the marketability of title draws an artificial distinction between the
significance of the certification for marketability and its significance
in reassuring a prospective buyer that the newly constructed wastewater system
has been duly inspected for compliance with the permitted design.  This
case involves the most common circumstance in which a person within the class
protected by the principles reflected in § 552(3) of the Second
Restatement is going to seek out and rely on the certification required by
Vermont’s wastewater-system permitting scheme.  Most purchasers of
property do rely on lawyers to advise them, and protect their interests, in
connection with the transaction.  To suggest that because the lawyer’s
immediate task is evaluating the marketability of title, the lawyer is
unconcerned with and does not rely on the truth of representations on which the
marketability determination rests, is to ignore the reasons underlying
§ 552(3) in the first place.

¶ 50.         We
can easily infer from this record that the lawyer sought the certificate in
order to complete his analysis of the marketability of the seller’s
title.  But I do not believe that we can infer as a matter of law that the
lawyer, acting on plaintiffs’ behalf, did not rely on the accuracy of
the representations, or that the truth of the statements in the certificate was
immaterial to the lawyer’s actions.  If the lawyer had known the
statements were inaccurate, and for purposes of this summary-judgment motion we
assume that they were, a factfinder could most certainly infer that the lawyer
would not have advised the plaintiffs to proceed without taking further steps
to ensure that the wastewater system was properly constructed.  By
inferring as a matter of law that the truth of the statements in the
certificate was of no consequence to plaintiffs’ lawyer—who had a fiduciary
duty to them in connection with this transaction—the majority has failed to
draw reasonable inferences in favor of the nonmoving party.[13]

¶ 51.        
For the above reasons, I dissent.  I would reverse the judgment of
the trial court.


 
 
  
 
 
  
 
 
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 Associate Justice
 
 


 














[1] 
The parties do not dispute that the certificate was intended for the Agency’s
use in approving a wastewater permit for the property, but implicit in their
briefs is a dispute over whether the certificate was intended for any other
use.  Defendant asserts in its statement of undisputed facts that “any use
beyond [permitting] was not the intent of the certification,” but also argues
in its brief that this is a disputed fact that requires resolution for
plaintiffs to succeed on summary judgment.  Strangely, plaintiffs
respond to this assertion by stating that “[t]he statutes cited by plaintiffs
define the purpose of the certification—it is not something Defendant is free
to vary.”

 

We do not see where and how this fact is in dispute, nor
do we read defendant’s statement as an attempt to “vary” the statutes. 
Section 1973(e), requires certification from a licensed professional
before a permit is effective.  Clearly the Agency is the intended
recipient.  That other parties may benefit from or rely on such
information does not alter the intent.  This is not a fact that the
superior court relied on in its decision, and while we believe this has some
relevance to the issue, we discern no live dispute that any other party was the
intended recipient of the certificate or that it served any purpose other than
rendering the necessary permits effective.





[2] 
Defendant argues that the reason for the sewage disposal system’s failure is
“hotly disputed” and that consequently plaintiffs’ summary judgment motion
cannot survive.  Plaintiffs, on the other hand, contest that this fact is
in dispute, citing procedural failures on the part of defendant in submitting
the appropriate documents in compliance with Vermont Rule of Civil Procedure
56(c).  Indeed the survival of plaintiffs’ claims—and the grant of their
summary judgment motion—depends on defendant’s responsibility for the failure
of the sewage disposal system.  We need not resolve this issue, however,
because even assuming plaintiffs’ version of the facts is undisputed,
plaintiffs are not entitled to judgment as a matter of law on their
claims.  As we explain in our analysis below, defendant is entitled to
summary judgment no matter the cause of the system’s failure.

 





[3] 
Plaintiffs’ expert also concluded that a collar between the concrete container
for the pump and the cover allowing access to the pump was not sealed
properly.  Plaintiffs have not relied upon this alleged deficiency in
their brief to this Court.

 





[4] 
Plaintiffs also alleged breach of contract between D&L and defendant and
violation of the CPA on the 2005 contract between plaintiffs and
defendant.  Plaintiffs have abandoned these claims on appeal.





[5] 
It is under this public duty exception that the parties’ dispute over the
intended use of the certificate becomes irrelevant.  While the
relationship of the parties in the transaction is more determinative under
subsection (2), here we need only conclude that plaintiffs were of a class benefitted
by the certificate—not the parties for whom the certificate was intended.

 





[6] 
For the purposes of this discussion, the terms “actual reliance” and “direct
reliance” are interchangeable.  The superior court used the term “direct,”
while the case law is inconsistent in its use of the terms “direct” or
“actual.”  





[7] 
The “fraud-on-the-market” theory has its origins in securities fraud claims
under § 10(b) and Rule 10b-5 of the Securities Exchange Act, and posits
that an investor who buys or sells stock at a price set by the market relies on
the integrity of that price.  As the market price is based upon publicly
available information, the investor is presumed to rely on any
misrepresentations that materially affected the integrity of the price.  Basic
Inc. v. Levinson, 485 U.S. 224, 241-42, 247 (1988).  This theory has
been invoked repeatedly in dual claims of securities fraud and common law
negligent misrepresentation, and the courts have been firm in striking down the
fraud-on-the-market theory for negligent misrepresentation and requiring,
instead, actual reliance on the information by the aggrieved plaintiffs. 
See, e.g., In re ValuJet, Inc., 984 F. Supp. 1472, 1481 (N.D. Ga. 1997)
(noting that majority of courts reject fraud-on-the-market theory for negligent
misrepresentation claims, and collecting cases).





[8]
 The second prong requires causation and injury, as we recently explained
in Dernier v. Mortgage Network, Inc., 2013 VT 96, ¶¶ 57-63, 195 Vt.
113, 87 A.3d 465.  We recognize that there is an issue about whether
plaintiffs have shown causation, but we prefer to decide whether summary
judgment should have been granted to defendant on the CPA claim based on
whether defendant could be an “other violator.”





[9] 
In Blatterfein, the court concluded that the architect could be liable
under the CPA because of the architect’s involvement in the sale of the
property, stating:

 

  By their very nature, an
architect’s professional services typically relate to real estate.  Where
the question is solely one concerning the quality of those professional
services, there may be no adequate basis for asserting liability under the
Consumer Fraud Act.  But where the architect has involved himself either
as a principal or a retained professional in a real estate marketing venture
wherein he permits his services to be held out as part of what is being sold,
or provided by way of influencing purchasers to enter into contracts, or to
maintain contractual relationships, he becomes subject to the Consumer Fraud
Act just as every other person involved in inducing the sale or preserving the
transaction may be.  Based on what has been shown thus far, plaintiffs are
entitled to an opportunity to prove that [the architect] engaged in conduct
prohibited by the Act and that he is liable under its provisions.

732 A.2d at 564.





[10] 
The provisions of the Third Restatement cited in this opinion were approved by
the American Law Institute in 2012.  89th Annual Meeting: 2012
Proceedings, Discussion of Restatement of the Law Third, Torts: Liability
for Economic Harm, 89 A.L.I. Proc. 22, 46-47 (2012).  The A.L.I.
states that “[o]nce it is approved by the membership at an Annual Meeting, a
Tentative Draft . . . represents the most current statement of the American
Law Institute’s position on the subject and may be cited in opinions or briefs
. . . until the official text is
published.”  Am. Law Inst., Overview, Project Development, http://www.ali.org/index.cfm?fuseaction=projects.main.

 

With slight modifications not relevant here,
§ 5(3) of the Third Restatement reflects the same principles as § 552
of the Second Restatement.  See Third Restatement § 5 cmt. a (“[This section] is based on the logic of
Restatement Second, Torts § 552, which a majority of states have adopted.
The black letter of this Section, which covers liability for negligent
statements, repeats § 552 with small changes.”).

In this dissent, I draw upon both
of these provisions and their associated comments and illustrations.





[11] 
Plaintiffs in this case do not claim that they relied on the actions of a state
agency or other third party that, in turn, relied on the misrepresentations.
 See, e.g., In re Sofamor Danek Grp., Inc., 123 F.3d 394, 403-04
(6th Cir. 1997) (holding that plaintiffs did not allege actual reliance on
defendants’ misrepresentations—and thus could not rely on § 552 of the
Second Restatement—where plaintiff proffered only “fraud-on-the-market” theory,
alleging that defendants’ negligent misrepresentations affected market prices,
which induced plaintiffs to enter into certain transactions); Goldman Servs.
Mech. Contracting, Inc. v. Citizens Bank & Trust Co., 812 F. Supp. 738,
742-43 (W.D. Ky. 1992) (holding that direct reliance was not shown where
plaintiffs relied on third party’s actions which were, in turn,
undertaken in reliance on alleged misrepresentation by defendant); Brinkman
v. Barrett Kays & Assocs., P.A., 575 S.E.2d 40, 44 (N.C. Ct. App. 2003)
(holding that plaintiffs did not allege sufficiently direct reliance where
allegation was that defendants misrepresented quality of their waste-removal
systems in their permit application to state agency; that agency, relying on
the misrepresentation, issued the permits; and that, in turn, the plaintiffs
relied on the fact that the agency had issued the permits to conclude
that their waste-disposal system was functioning properly).  Rather,
plaintiffs claim direct reliance on the misrepresentations themselves,
which defendant made to plaintiffs’ attorney, who was acting on plaintiffs’
behalf.





[12] 
Defendant objected to plaintiffs’ submission of the evidence in question in
connection with its reply in the summary-judgment briefing below.  After
ruling on the merits of the cross-motions for summary judgment, the trial court
dismissed the motion as moot.





[13] 
The majority also cites the fact that the plaintiffs had already signed a contract
for sale, and states that there is no evidence that the contract was
conditioned on the finality of the wastewater-disposal system.  Ante,
¶ 27.  Such sales are generally contingent on marketable title, and
often on satisfactory inspection.  If the majority is implying that
plaintiffs were obligated to go through with the purchase even in the absence
of a certificate completing the wastewater-permitting process, even without
marketable title, or even in the face of a demonstrated departure from the
approved design in the construction of the wastewater-disposal system, there is
simply no basis in the record to support that claim.  If anything, it
flies in the face of common experience.